

# NUMBER 13-17-00417-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JOSEPH D. CANCINO,**                                                                                    **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                                    **Appellee.**

### On appeal from the 94th District Court of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Chief Justice Contreras**

Appellant Joseph D. Cancino was convicted of murder, a first degree felony, and aggravated assault with a deadly weapon, a second degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02, 22.02 (West, Westlaw through 2017 1st C.S.). He was sentenced to concurrent forty-eight-year and five-year prison terms for the respective offenses. On

appeal, he raises thirteen issues making five general arguments: (1) the evidence was insufficient to support the convictions; (2) the trial court and the prosecutor gave incorrect instructions to the jury; (3) members of the victim's gang communicated with and intimidated jurors; (4) appellant's Fifth Amendment rights were violated; and (5) his convictions were based on "incorrect, uncorrected testimony." We affirm.

## I. BACKGROUND

In the early morning of July 10, 2016, gunfire erupted at the Office Club, a bar on Rand Morgan Road in Corpus Christi, resulting in the death of Roddy Rodriguez and a minor injury to Loreto "Larry" Gonzalez. Appellant was charged by indictment with the murder of Rodriguez and the aggravated assault of Gonzalez.

At trial, testimony established that appellant was playing pool at the bar on the night in question along with his half-brother Roman Cancino Jr. and Roman's wife Karen. Rodriguez, a member of the Texas Syndicate street gang (TS), was at the bar with Gonzalez and Samantha Trejo. Rodriguez and his associates were members of a branch of TS known as the Goon Squad.

Video surveillance recordings from several locations in and around the bar were played for the jury and entered into evidence. The videos showed that appellant and Rodriguez were initially standing in different sections of the bar. At one point, Rodriguez got up to use the restroom; as he was walking back to his seat, he bumped into appellant, and the two argued before separating. Appellant can be seen on the video recordings talking on his cell phone. Later, according to the testimony of several witnesses, as Rodriguez was leaving the bar with his associates, appellant fatally shot him in the head and chest, outside of the view of the surveillance cameras. Gonzalez retrieved a gun

2

from his car in the parking lot and returned fire. The principal issues at trial were whether appellant's actions were intentional and whether they were made in self-defense.

## A. State's Witnesses

Jason DeLeon testified that he used to work at the Office Club and arrived there at around 10:30 or 11:00 p.m. on the night of July 9, 2016. At some point, he went to a different bar for about an hour, and when he came back he noticed there was a commotion outside. He observed a "thicker lady wearing a blouse and maybe some shorts" retrieve something from a Cadillac and return to the bar. He then went into the bar and saw Rodriguez paying his tab. According to DeLeon, as Rodriguez walked out of the bar after paying, a group of people including appellant came up to Rodriguez and started arguing. Rodriguez turned around and pointed his finger. DeLeon stated: "As soon as [Rodriguez] points, [appellant] pushes his friend over and fires. You hear pop, pop, pop, and then, I'm standing there, I watch it all, and then, as soon as they go out, he's outside firing also." DeLeon stated that appellant was "maybe less than five feet away" from Rodriguez and "running towards [Rodriguez]" when the shots were fired. He denied that Rodriguez was holding anything in his hands at the time, that Rodriguez motioned toward his waistband or his pocket before being shot, or that there was a "scuffle" before the shooting. He said appellant was "hiding behind somebody and looking to shoot." After the shooting, DeLeon checked on Rodriguez's condition; upon seeing that he had a bullet wound on his forehead, DeLeon called the police.

DeLeon stated he was not intoxicated during these events, but he conceded that the inside of the bar was poorly lit. On cross-examination, he acknowledged that, according to the surveillance videos, the woman who went to the Cadillac may not have

returned to the bar immediately afterward, as he had testified he observed.

Rey Herrera was sitting at the bar about six feet away from the door at the time of the shooting. As Rodriguez was leaving the bar with a female associate, Herrera could hear him say: "So what you want to do it here." Herrera said he had a "clear view" of Rodriguez leaving the bar, but he did not see a "group of people converge towards the door," and he did not see Rodriguez "struggling" with anyone. He heard shots and saw that Rodriguez fell on his back, blocking the doorway.

Chelaine Henderson, a former employee at the Office Club, was at the bar that night. She saw two groups of people—one by a pool table and a smaller group at the bar—"throwing hands up like we were gonna fight or whatever." She followed Rodriguez outside to make sure everything was okay and there would be no fights; he assured her everything was fine, so she went back in. About half an hour later, he came back in to pay his tab. When he started to walk out, she saw what she described as a "bum rush"— the group of people that had been by the pool table rushed toward the door. Henderson then heard four or five shots fired, and she later saw Rodriguez laying dead in the entryway. She denied that Rodriguez struggled with anyone or pulled a weapon prior to being shot.

Henderson conceded that she has mediocre eyesight and is supposed to wear glasses but does not. She did not view the surveillance videos before testifying. On cross examination, she admitted that she had four drinks at the bar that night. When watching the surveillance video, she stated that Rodriguez appeared to be making hand gestures toward one of the men at the pool table.

Thomas Soliz, who was playing pool in the Office Club that evening, gave

4

testimony that was largely similar to that of DeLeon, Herrera, and Henderson. As Rodriguez was leaving the bar, appellant's group approached him and shots were fired. Soliz saw Rodriguez throwing gang signs on the night in question.

Celeste Paiz testified she was at the bar when she heard a man next to her argue with people behind them. Rodriguez walked toward the door at one point, and she heard him say "one on one" while holding a phone to his ear. He did not have a gun or a knife in his hand. She heard six to eight gunshots. Paiz did not see Rodriguez reach for his waistband or struggle with anyone prior to being shot. She acknowledged on cross-examination that Rodriguez may not have been speaking into the phone when he said "one on one."

Cody Jo McDaniel, who also patronized the Office Club on the night of July 9, acknowledged that she can be heard on the surveillance video saying "Are you gonna kill him with your knife?" while standing near Rodriguez. McDaniel said this remark had nothing to do with Rodriguez, but was directed at a different bar patron, who was angry because he had earlier been ejected from a different pool hall, where McDaniel was employed as a bartender.

Trejo testified that she was with Rodriguez and Gonzalez at the bar that night. She stated that Rodriguez was her boyfriend and that the Goon Squad is "just family friends" and "has nothing to do with [TS]." At one point, Rodriguez went to use the restroom, and he "looked upset" when he returned a few minutes later. Trejo testified that Rodriguez pointed to appellant and remarked, "[T]hat's that nigga Ghost over there," referring to appellant's nickname.

Trejo stated that, after Rodriguez said he wanted to leave the bar "to avoid conflict,"

5

she, Rodriguez, and Gonzalez went outside. Trejo moved her car from a parking spot to a location in front of the bar that was roughly the same distance from the entrance of the bar as was the parking spot. Meanwhile, Rodriguez was speaking on the phone outside the bar, but Trejo did not hear Rodriguez's phone conversation and did not know who he was talking to. When the phone call ended, Rodriguez went back into the bar to pay, and Trejo and Gonzalez followed him. She believed that the video recording showed Rodriguez throwing a gang sign at that point.

As the three began to exit the bar again, appellant and "some other gentleman with a hat" approached them. Trejo testified that someone yelled "somebody stop him" toward Rodriguez. Rodriguez stopped at the front door and turned around to his left. Trejo then heard gunshots coming from inside the bar. Appellant ran out of the bar, passing in front of Trejo. Trejo saw that Rodriguez had been shot dead. Gonzalez then took Rodriguez's diamond cross necklace off of him and gave it to Trejo, who testified that the necklace had sentimental value to her because "[o]ne of [Rodriguez's] friends had passed away" and "that used to be his charm." Later, after Trejo had been placed in a police car, she took the necklace out of her pocket and put it on. She denied that she had it in her pocket in order to conceal it from police, and she denied that Rodriguez ever told her he had stolen it from appellant. Instead, Trejo testified that Rodriguez had the necklace since before their relationship started six years prior.

Trejo did not know why she moved her car to the front of the bar entrance instead of in an "authorized parking space," but she denied that Rodriguez told her to park there so he "could make a quick getaway." According to Trejo, Rodriguez never indicated to her that he wanted to fight appellant, and he did not attack appellant. She denied that

6

Rodriguez was intoxicated during the events in question, and she denied that he brought a gun to the bar. She also denied that Gonzalez had been injured prior to the shooting.

Andrew Garcia, an inmate at the Nueces County Jail accused of murder, testified that appellant was housed in the cell next to him while awaiting trial. Appellant told Garcia he was in jail because he was accused of murder, and appellant said he was a member of TS. Garcia told appellant that he had heard about Rodriguez's killing "in the streets" and that he had heard from his friends that Rodriguez had stolen some jewelry and money from appellant's house. Garcia told appellant that he had heard from friends that appellant "asked for permission from the gang members if he could, you know, take care of his business" and "[t]he gang member said, yeah, go ahead handle your business." Garcia understood this to mean that appellant "got the green light" to kill Rodriguez.

According to Garcia, appellant told him "the first part is true, the second part didn't go down like that." Appellant explained to Garcia that Rodriguez broke into his house and stole a Rolex watch, a "gold cross with diamonds on it, a medallion, a real expensive gold chain that belonged to him and some money." According to Garcia, appellant said that he told Rodriguez he wanted the watch back because it belonged to his dad, and he would be willing to trade "real expensive rims" for it. Garcia testified that appellant told him: "Roddy said, I didn't break inside your house but I know who did. And so he said, if you give me the rims I'll beat him up for you, and [appellant] told him, I don't need you to beat up anybody for me, I can beat him up myself . . . ."

Garcia testified:

[A]ppellant told me one day that if . . . he told me how he did it that I would be saying, wow, you know. He said, I did it real slick. . . .

I asked [appellant] where did—how did it happen, right? And I told him, did

7

it happen inside the bar. He said, no, it happened at the door. And I said, what, you-all just started blasting at each other? And he said something like that. And I said where did you hit him? He said in the head. . . . And I said—and he said that he grazed the other guy.

Garcia recalled that appellant said he used a .40 caliber pistol and that he "got rid of" the weapon after the shooting. Garcia also stated that appellant told him he previously had sex with Rodriguez's ex-girlfriend and had posted "revealing" pictures of her on Facebook prior to the murder.

When asked what appellant's demeanor was when he made these admissions, Garcia testified that appellant was "[b]ragging, like he was proud of himself and he thought he was real slick about what he did and that there was no way they were gonna get him . . . . He didn't say anything about self-defense." When asked what, if anything, appellant said about Gonzalez, Garcia testified: "Just that he wasn't gonna be—he wasn't—that he wasn't gonna say anything. . . . Supposedly, his dad had taken care of all that."

On cross-examination, Garcia conceded that he had told the district attorney's office that he would be willing to testify against appellant in exchange for a plea deal on his current charges, but he said "[t]hey told me no."

From the scene, police recovered two .40 caliber pistols, one of which was registered to Gonzalez, and eleven spent bullet casings—three from inside the bar, seven from the parking lot, and one from the floorboard of an orange Mustang parked in the parking lot. Ten of the casings were fired from the same gun, but they were not fired from either of the guns recovered by police at the scene. Upon viewing the surveillance videos, police determined that Gonzalez fired at appellant as Gonzalez ran to his Mustang in the parking lot.

8

Rodriguez had a closed pocket knife, a wallet, and a phone in his pockets when he died. An autopsy performed by Nueces County Medical Examiner Ray Fernandez revealed that Rodriguez's body showed no searing, soot, or stippling. Fernandez stated that this indicates Rodriguez was shot from a distance of at least about two and a half feet, though he acknowledged that his autopsy report stated that the range for both gunshots was "indeterminate." He did not examine Rodriguez's clothing, as that type of testing is not done by the medical examiner, but he did not see any soot on Rodriguez's clothing as depicted in a photo.

David Curtiss, a firearms examiner for the Corpus Christi Police Department, testified that two bullets which were found in Rodriguez's body, along with one bullet found lodged in the grill of a car in the parking lot, were fired from a gun that had polygonal rifling. The gun registered to Gonzalez did not have polygonal rifling.

The State called appellant's half-brother Roman as an adverse witness. Roman did not recall telling police that appellant left the bar before the shooting. According to the surveillance footage, Roman's wife Karen left the bar at around 1:25 a.m., and she returned about twenty to thirty minutes later. Roman denied that Karen left so she could bring appellant a gun, but he conceded that he owned two .40 caliber pistols, that he sold one of them, and that one of them is missing.

## B. Appellant's Witnesses

Karen Cancino testified that she suffers from polycystic ovary syndrome, a disorder which can cause "dysfunctional urine bleeding." She alleged that she left the Office Club at around 1:30 a.m. because she was bleeding due to her condition and needed to change her clothes.

9

Appellant testified that, because he was and is currently on parole, he "shouldn't have been at" the bar. He denied currently being a member of TS, but he said "at one point I was affiliated with them, until they put a red light on me." Appellant testified that in 2013, there was a burglary at his parents' house, where he was living at the time, and "quite a bit of jewelry" was stolen from him and his father. Appellant later saw a photo on the internet of Rodriguez wearing a necklace that he believed was stolen from his parents' house. He spoke to Rodriguez and a higher-ranking TS member, "Koast," about retrieving the necklace; however, he never got the necklace back, and he "just left it alone" because he "didn't want no problems." He was concerned about his safety in Rodriguez's presence because another higher-ranking TS member, "Turtle," told him "to be careful." He did not expect Rodriguez to be at the Office Club on the night of July 9, 2016. At one point, he bumped into Rodriguez near the bar's bathroom. According to appellant, Rodriguez's demeanor was "aggressive" and "angry." Appellant testified Rodriguez "was calling me outside and putting his hands like guns and calling me a pussy."

Appellant testified that the bartender told him that she had called the police. Appellant then called "Turtle" several times, hoping that "Turtle" could defuse any conflict with Rodriguez. "Turtle" advised appellant that Rodriguez "was going to leave and there was going to be no problems."

Defense counsel showed appellant text messages recovered from Rodriguez's phone, and they were entered into evidence. One of the messages, sent from Rodriguez to "Koast" at 1:34 a.m. on July 10, 2016, stated: "I'm hit ghost the snitch he's w I am." Appellant testified that this meant Rodriguez planned to kill him. Rodriguez then exchanged messages with "Turtle" as follows:

10

| "Turtle": | Wats up bro |
|---|---|
| Rodriguez: | U no |
| "Turtle": | U want to act like that bro. Bet ima meet up with u. Act hard like that in my face |
| | U can go tell whoever u want too. U disrespecting me first. Thats wats up |
| Rodriguez: | Come then |
| "Turtle": | Meet me |
| Rodriguez: | Come on then bro u ain't gonna save a rat |

Appellant testified that "rat" referred to him. According to appellant, Rodriguez was rebuking the efforts of "Turtle" to prevent appellant's killing.

> As to the shooting, appellant testified:

> I was walking to the door and I was like two feet away when I saw [Rodriguez] at the door facing me, and he reached for his waistband. Right then and there, I knew I had to defend myself, my life was in danger because I saw him reaching for his waistband, and I know what kind of a person he is and he—you know, he has hurt people before.

According to appellant, as he went to grab Rodriguez's hand, he saw Rodriguez "pull the gun out" with his finger on the trigger. Appellant stated: "I went for it, the gun went off a few times. I got a hold of it, and I ran." He denied that he pushed anyone out of the way before Rodriguez was shot, though he said Gonzalez pushed him from the side. Appellant denied conspiring with Trejo to kill Rodriguez, and he denied that Karen left the bar to bring him a gun.

## C. Verdict

The jury was charged on the indicted offenses and was instructed on the justification of self-defense, including the exception to that justification for provocation. *See id.* § 9.31(a), (b)(4) (West, Westlaw through 2017 1st C.S.). The jury found appellant

11

guilty as charged and sentenced him to prison terms of forty-eight years for the murder and five years for the aggravated assault. The trial court rendered judgment in accordance with the verdict, ordering the sentences to run concurrently. *See id.* § 3.03 (West, Westlaw through 2017 1st C.S.). Appellant filed a motion for new trial, which was denied. This appeal followed.

## II. DISCUSSION

### A. Evidentiary Sufficiency

By his first two issues, appellant contends the evidence was legally insufficient to support his conviction for murder, and by his third and fourth issues, he argues the evidence was insufficient to support his conviction for aggravated assault. Appellant contends by his fifth issue that "the State did not disprove [his] valid self-defense that was on video"; we construe this issue as a challenge to the sufficiency of the evidence to support the jury's rejection of his self-defense theory.

#### 1. Standard of Review

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Griffin v. State*, 491 S.W.3d 771, 774 (Tex. Crim. App. 2016); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West, Westlaw through 2017 1st C.S.). We determine,

12

based upon the cumulative force of all of the evidence, whether the necessary inferences made by the jury are reasonable. *Griffin*, 491 S.W.3d at 774.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *Malik*, 953 S.W.2d at 240. Here, a hypothetically correct charge would instruct the jury to find appellant guilty of murder if he (1) intentionally or knowingly caused Rodriguez's death by shooting him with a firearm or (2) intended to cause serious bodily injury and committed an act clearly dangerous to human life—i.e., shooting Rodriguez with a firearm—that caused his death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), (B)(2). It would instruct that appellant is guilty of aggravated assault if he intentionally, knowingly or recklessly caused bodily injury to Gonzalez and used or exhibited a deadly weapon while doing so. *See id.* §§ 22.01(a)(1) (West, Westlaw through 2017 1st C.S.), 22.02(a)(2).

A hypothetically correct jury charge would also instruct the jury that appellant was justified in using force against Rodriguez and Gonzalez when and to the degree he reasonably believed the force was immediately necessary to protect himself against Rodriguez's or Gonzalez's use or attempted use of unlawful force. *See id.* § 9.31(a). Self-defense is not an affirmative defense but is rather a "defense to prosecution" under penal code § 2.03. *See id.* § 2.03 (West, Westlaw through 2017 1st C.S.); *Zuliani v. State*,

13

97 S.W.3d 589, 594 (Tex. Crim. App. 2003). For this type of defense, a defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. *Zuliani*, 97 S.W.3d at 594 (citing *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. *Id.*; *see* TEX. PENAL CODE ANN. § 2.03(d). The burden of persuasion is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Id.* In reviewing the sufficiency of the evidence when a jury has rejected a claim of self-defense, in addition to considering the essential elements of the offense, we must determine, after viewing all the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914.

### 2. Analysis

In his brief, appellant incorrectly states that the State "was not able to provide one actual witness to the shooting" and that "[n]o one observed [appellant] with a weapon."[1] Still, he does not appear to dispute that the essential statutory elements of murder and aggravated assault were supported by sufficient evidence. Instead, he argues that the jury's rejection of his self-defense theory is "blatantly contradicted" by the extensive surveillance video evidence that was adduced at trial.

---

[1] Several witnesses observed the shooting, and DeLeon directly testified that he observed appellant shoot Rodriguez with a gun. Appellant himself testified that he "got a hold" of the gun and it "went off a few times."

14

Appellant's first five issues rely on the notion that the ordinary standard of review does not apply in this case. He contends that "[w]here the evidence includes multiple videos with audio of what occurred, the Court of Appeals becomes the original fact finder despite the ordinarily deferential standard of review." Appellant appears to base this argument on *Scott v. Harris*, in which the United States Supreme Court held that the lower court erred by "adopting" the plaintiff's assertions despite the fact that there was video evidence that "quite clearly contradicts" those assertions. *See* 550 U.S. 372, 378 (2007). In that case, a police officer engaged in a high-speed chase rammed the suspect's car from behind, causing the suspect's car to spin off the road and resulting in severe injuries to the suspect. *Id.* at 374–75. The suspect sued the officer alleging "excessive force resulting in an unreasonable seizure under the Fourth Amendment." *Id.* at 375–76. The officer's summary judgment motion was denied, and the court of appeals affirmed on the basis that the suspect's claims may have merit because "there was little, if any, actual threat to pedestrians or other motorists, as the roads were mostly empty and [the suspect] remained in control of his vehicle." *Id.* at 378. The supreme court reversed, however, based on its viewing of the video recording of the chase. The Court held that the suspect's story "is so utterly discredited" by the video "that no reasonable jury could have believed him"; therefore, there was no "genuine" dispute as to the facts and summary judgment was warranted. *Id.* at 380–81 ("The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.").

Appellant urges us to view the facts "in the light depicted by the videotape," as the *Scott* Court did, and to conclude that no rational juror could have found against his self-defense theory after viewing the surveillance videos. He specifically notes that, although

DeLeon initially testified that appellant "pushe[d] his friend over" before firing, DeLeon could not identify that "friend" when the recordings were played for him at trial. He contends that the video evidence "clearly" shows that "Rodriguez's intentions were to confront and kill [appellant] that night with the help of his associates," and that appellant "feared for his life, sought to leave the club peacefully, and was pursued by Rodriguez and his associates who were the aggressors."

We have viewed the video recordings entered into evidence in this case, and we cannot agree with appellant that they discredit or contradict the testimony upon which the jury based its verdict. The recordings establish that appellant and Rodriguez exchanged words outside the bar's bathroom; that Rodriguez made hand gestures to appellant on multiple occasions following the bathroom confrontation; and that the shootout happened as Rodriguez and his associates were leaving the bar after he paid his tab. However, the surveillance videos do not depict the area surrounding the entrance of the bar, and therefore, they do not show appellant or Rodriguez at or around the time the fatal shots were fired. Therefore, there is no basis for us to disturb the jury's implicit decisions (1) to disbelieve appellant's testimony that Rodriguez reached for his waistband and brandished a gun immediately prior to the shooting, and (2) to believe the other witnesses who testified that Rodriguez was not armed, did not reach for his waistband, and did not threaten appellant with unlawful force. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) ("Because the jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony.").

*Scott* is distinguishable most obviously because the video in that case, according

16

to a majority of the United States Supreme Court, directly contradicted the plaintiff's factual assertions which were the basis of his lawsuit. *See id.* The videos in evidence here, though useful for background purposes, do not depict the specific events upon which the indicted offenses and appellant's self-defense theory were based. Therefore, they had no potential to "utterly discredit[]" the testimony of the other witnesses—including DeLeon, Herrera, Henderson, Solis, Paiz, and Trejo—specifically regarding those events. *See id.*[2] Moreover, in rejecting appellant's self-defense theory, the jury could have also considered Garcia's testimony that (1) appellant believed Rodriguez had stolen his father's watch from him, and (2) appellant admitted that he "did it real slick." *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004) ("Motive is a significant circumstance indicating guilt."); *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd) ("[A]ny conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he committed the act with which he is charged.").

Appellant also emphasizes in his sufficiency argument that Gonzalez did not testify at trial. He contends Gonzalez's testimony "must be presumed to be favorable" to him because, "where the state is in control of the witness and does not call that witness, it

---

[2] Further, as the State notes, appellant's proposed standard of review reads too much into *Scott.* Even if the video recordings depicted the shooting and contradicted the testimony of some witnesses, we would not "become[] the original fact finder." Rather, we would still review all of the evidence to determine whether the jury's verdict is rational, as illustrated by the following hypothetical:

> The store clerk at trial identifies A as the robber. A properly authenticated surveillance videotape of the event clearly shows that B committed the robbery. But, the jury convicts A. It was within the jury's prerogative to believe the convenience store clerk and disregard the video. But based on all the evidence the jury's finding of guilt is not a rational finding.

*Brooks v. State*, 323 S.W.3d 893, 907 (Tex. Crim. App. 2010) (plurality op.) (demonstrating "proper application of the *Jackson v. Virginia* legal-sufficiency standard").

creates a presumption that the witness would be favorable to the Appellant." He cites *Roberts v. State*, in which the Texas Court of Criminal Appeals held, in the context of overruling a complaint regarding the lack of a jury instruction on circumstantial evidence, as follows:

> This Court recognizes that the failure of the State to call or explain why it does not call an available witness that would directly connect appellant to the offense creates a presumption that the witness would be favorable to the appellant. The rule is applicable only to cases in which the State is relying solely on circumstantial evidence. However, there is no duty to call all available witnesses when there is other direct evidence available in the case.

489 S.W.2d 893, 894 (Tex. Crim. App. 1972) (citations omitted). Appellant has not established that the State "controlled" Gonzalez or that he was "an available witness" as contemplated in *Roberts*. Further, as the State points out, the court of criminal appeals has since abolished the concept, relied upon in *Roberts*, that juries may convict on circumstantial evidence only if every reasonable hypothesis other than guilt is excluded. *See Geesa v. State*, 820 S.W.2d 154, 159 (Tex. Crim. App. 1991), *overruled on other grounds by Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000). In any event, direct evidence of appellant's culpability was adduced in this case, including the eyewitness testimony of DeLeon that appellant shot Rodriguez and the testimony of multiple witnesses that Rodriguez did not reach for his waistband or pull a weapon. Therefore, assuming but not deciding that this passage from *Roberts* remains valid law, it would not apply here.

Viewing all of the evidence in the light most favorable to the verdict, we conclude a rational trier could have found the essential elements of the charged offenses, and against appellant on his self-defense issue, beyond a reasonable doubt. *See Griffin*, 491

18

S.W.3d at 774; *Saxton*, 804 S.W.2d at 914. Appellant testified to facts that, if believed, may have supported his assertion that his actions were immediately necessary to protect himself against Rodriguez's attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.31(a). However, other witnesses testified to facts which, if believed, controvert that assertion. Under these circumstances, where the video evidence is inconclusive regarding the ultimate issues before the jury, we must defer to the jury's resolution of the evidentiary conflict. *See Brooks*, 323 S.W.3d at 899; *see also Reeves v. State*, 420 S.W.3d 812, 820 (Tex. Crim. App. 2013) (refusing to revisit the jury's resolution of a conflict in evidence regarding a self-defense theory).

Appellant's first five issues are overruled.

## B.     Jury Instructions

By his thirteenth issue on appeal, appellant argues that "[t]he jury instructions allowed [his] conviction when he had a valid defense of self-defense." He contends that, in its instruction on self-defense in the jury charge, the trial court "added an immediacy requirement to the threat that [appellant] faced which is not present in the law." Appellant further argues that the prosecutor "incorrectly argued in closing not that someone feared that one would attempt to use deadly force in the future but that immediacy was required."

The instruction regarding self-defense in the jury charge stated in part:

[Y]ou are instructed that a person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force. A person is justified in using deadly force against another if he would be justified in using force against the other in the first place, as above set out, and when he reasonably believes that such deadly force is immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

. . . .

19

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack. It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life and person from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the other person's use or attempted use of unlawful deadly force.

The application paragraph with respect to the murder charge stated in part:

Now, if you find from the evidence beyond a reasonable doubt that [appellant] did cause the death of [Rodriguez] as alleged in the indictment, but you further find from the evidence, as viewed from the standpoint of the defendant at the time, that from the words or conduct, or both, of [Rodriguez] it reasonably appeared to the defendant that his life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury from the use of unlawful deadly force at the hands of [Rodriguez], and that acting under such apprehension and reasonably believing that the use of deadly force on his part was immediately necessary to protect himself against [Rodriguez]'s use or attempted use of unlawful deadly force, he SHOT [Rodriguez] WITH A FIREARM, then you should acquit the defendant on the grounds of self-defense . . . .

The remarks by the prosecutor which appellant complains of are as follows:

[A]s it goes to self-defense, [the court] read to you the law on self-defense and there are a few things I wanted to point out to you. Okay. The first is, when you get here, it's in paragraph 5, it says that a person is justified in using deadly force against another if he would be justified in using force against the other in the first place as set out above, and when he reasonably believes that such deadly force is immediately necessary. So the reason I wanted to point it out to you is *the law requires immediacy, okay? Not the idea that at some point in the future he could potentially harm, but that at that point immediately, you're facing that force, okay?* So it's one of the things I wanted to point out to you.

Also, it requires that under the term "reasonable belief," reasonable belief

20

as meant here is that a belief that would be held by an ordinary and prudent person in the same circumstances as the Defendant. *So what that means is, what would an ordinary and prudent person think, in terms of the immediacy and in terms of any force that they may have been faced with or not faced with.*

(Emphasis added.)

The trial court is required to give the jury a written charge "distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West, Westlaw through 2017 1st C.S.). Here, both the instruction and application paragraph of the jury charge tracked the self-defense statute, which explicitly states that the actor must "reasonably believe[] the force is immediately necessary to protect the actor" in order for the defense to apply. TEX. PENAL CODE ANN. § 9.31(a). Accordingly, the trial court's written charge to the jury did not contain error.

Appellant argues that the prosecutor misinformed the jury by implying that the *threat* against the defendant must be "immediate" in order for the defense to apply, not merely that the *force* used against the other person be "immediately necessary." We do not construe the prosecutor's remarks as making that implication. In any event, to the extent appellant complains about an improper jury argument, he has failed to preserve the issue because no objection was made at trial. *See* TEX. R. APP. P. 33.1(a); *Hernandez v. State*, 538 S.W.3d 619, 622–23 (Tex. Crim. App. 2018) ("The right to a trial untainted by improper jury argument is forfeitable. In order to claim on appeal that an instruction to disregard was inadequate to cure erroneous jury argument, the defendant must object and pursue his objection to an adverse ruling. If he fails to pursue his objection to an adverse ruling, he forfeits his right to complain on appeal about the argument. Even an inflammatory jury argument is forfeited if the defendant does not pursue his objection to

21

an adverse ruling." (Citations omitted)).

We overrule appellant's thirteenth issue.

## C. Motion for New Trial

Appellant's remaining issues concern grounds raised in his motion for new trial. We review the trial court's denial of that motion for abuse of discretion. *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017). We must uphold the ruling if it is within the zone of reasonable disagreement and will reverse only if no reasonable view of the record could support the ruling. *Id.*

### 1. Improper Juror Communication and Intimidation

By his sixth and seventh issues, appellant argues that his federal and state constitutional rights were violated because "Goon Squad [TS] members communicated with the jurors and prejudice is presumed." By his eighth issue, he argues he was deprived of a fair and impartial jury because the jurors were "intimidated" by this communication.

A defendant has a constitutional right to an impartial jury. *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim. App. 1996) (citing U.S. CONST. amends. VI, XIV; *Holbrook v. Flynn*, 475 U.S. 560 (1986)), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex. Crim. App. 2014); *see* TEX. CONST. art. I, §§ 13, 19. To obtain a reversal based on external juror influence, an appellant must show actual or inherent prejudice. *Howard*, 941 S.W.2d at 117. To determine inherent prejudice, we look to whether "an unacceptable risk is presented of impermissible factors coming into play." *Holbrook*, 475 U.S. at 570. Actual prejudice occurs when jurors "actually articulated a consciousness of some prejudicial effect." *Howard*, 941 S.W.2d at 117. "[S]pectator conduct or expression

which impede[s] normal trial proceedings w[ill] not result in reversible error unless an appellant show[s] a reasonable probability that the conduct or expression interfered with the jury's verdict." *Id.*

When a juror converses with an unauthorized person about the case, injury to the accused is presumed, and a new trial may be warranted. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000); *Chairs v. State*, 878 S.W.2d 250, 253 (Tex. App.—Corpus Christi 1994, no pet.); *see* TEX. CODE CRIM. PROC. ANN. art. 36.22 (West, Westlaw through 2017 1st C.S.) ("No person shall be permitted to converse with a juror about the case on trial except in the presence and by the permission of the court."); TEX. R. APP. P. 21.3(f) (providing that a trial court must grant a new trial "when a juror has talked with anyone about the case"). The communication need not rise to the level of a conversation. *Mize v. State*, 754 S.W.2d 732, 739 (Tex. App.—Corpus Christi 1988, pet. ref'd) (citing *McIntire v. State*, 698 S.W.2d 652, 659 (Tex. Crim. App. 1985)). But the appellant has the burden to show that a communication occurred which "involved the specific case at trial and was more than an innocuous, unrelated comment or exchange." *Chairs*, 878 S.W.2d at 253 (citing *Romo v. State*, 631 S.W.2d 504, 506 (Tex. Crim. App. 1982)); *see Patrick v. State*, 906 S.W.2d 481, 498 (Tex. Crim. App. 1995).

At a hearing on appellant's motion for new trial, appellant's trial counsel testified that "[a]t least one" trial spectator had the word "Goon" tattooed on his neck. Counsel explained that several spectators' clothing, their "general demeanor," and their "close friendship" with the State's witnesses indicated to him that "they wanted to make it obvious that they were members of [TS]." He testified these spectators "[g]ather[ed] around the witnesses every opportunity that they had, conferr[ed] with some of the witnesses to some

23

small extent in the courtroom, but to a large extent outside of the courtroom, show[ed] what appeared to be some animosity towards the Defense, toward me, staring, that sort of thing." Counsel testified that the trial spectator with the neck tattoo "mouthed some words to one of the jurors and the juror gave him a signal, a hand signal and mouthed something back," though he did not know what the mouthed words were or what the hand signals meant. Counsel further testified that "one of jurors indicated that his tires had been slashed" and, though the juror attributed this to "kids in the neighborhood," counsel speculated that TS members were trying to send a "message" to return a guilty verdict.

The State contends that appellant failed to establish that any improper communication took place. We agree. Although counsel testified that a juror communicated via mouthed words and hand signals with an audience member who bore a "Goon" tattoo, there was no evidence as to the meaning or content of that communication. Accordingly, appellant did not meet his burden to show that any such communication "involved the specific case at trial and was more than an innocuous, unrelated comment or exchange." *See Chairs*, 878 S.W.2d at 253. Moreover, with respect to conduct by other trial spectators possibly influencing or "intimidating" the jury, though appellant's trial counsel stated that these spectators "show[ed] . . . animosity" toward the defense by their conduct, there is no evidence the jury was aware of this conduct. Accordingly, appellant has not shown a reasonable probability that the conduct of these spectators "interfered with the jury's verdict." *Howard*, 941 S.W.2d at 117. We overrule appellant's sixth, seventh, and eighth issues.

### 2. Fifth Amendment Violation

By his ninth issue, appellant contends that his Fifth Amendment right against

24

compelled self-incrimination was violated because "[a] juror based her decision on the fact that she did not hear evidence from the defendant." At the new trial hearing, appellant's trial counsel testified:

> In the jury room, after the verdict, one of the jurors inquired as to why they had not had access to [appellant's] telephone. That telephone played a major role in the trial of the case and they obviously were asking about evidence that was not before them, inquiring as to why the Defendant didn't put on that evidence, and shifting the burden of presenting evidence to the Defendant instead of the prosecution, and I was quite concerned about that. . . . [A]pparently, there had been some discussion about the truthfulness of [appellant] in the jury room with regard to what was being discussed on that telephone, and apparently, there had been discussion to the effect that if what he was saying was true, he should have produced the telephone.[3]

Appellant's trial counsel noted that the State did not have appellant's cell phone in its custody and did not produce appellant's cell phone records at trial.

Appellant cites *Powell v. State*, 502 S.W.2d 705 (Tex. Crim. App. 1973), for the proposition that "when jurors discuss one's failure to bring forth evidence and consider it in their deliberations, it violates the defendant's right to a fair trial and results in reversal of the conviction." But the *Powell* Court found no reversible error where "three jurors asked the question as to why the appellant did not tell his side of the story," reasoning that "[n]owhere in the record is there any reference to an answer being given or that the matter was considered by anyone as a circumstance against the appellant." *Id.* at 711.

In this case, appellant did tell his side of the story at trial; therefore, his right against

---

[3] The State argues in part that the argument in appellant's ninth issue "attempts to circumvent" Texas Rule of Evidence 606(b). *See* TEX. R. EVID. 606(b)(1) ("During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters."). But the State did not object to the testimony of appellant's trial counsel at the new trial hearing.

compelled self-incrimination is not implicated. *See* U.S. CONST. amend. V. Moreover, a defendant's failure to produce non-testimonial evidence is not akin to a defendant's refusal to testify against himself, and there is nothing preventing the State from commenting on the defendant's failure to produce such evidence. *See Patrick*, 906 S.W.2d at 491 ("A remark that calls attention to the absence of evidence which only the defendant could supply will result in reversal; however, if the language can reasonably be construed to refer to appellant's failure to produce evidence other than his own testimony, the comment is not improper."); *see also Bible v. State*, 162 S.W.3d 234, 249 (Tex. Crim. App. 2005) (concluding that "the prosecutor's reference to the absence of documentary evidence did not constitute a shifting of the burden of proof"); *O'Bryan v. State*, 591 S.W.2d 464, 479 (Tex. Crim. App. 1979) ("It is well settled that the prosecutor, in argument, may comment upon the defendant's failure to call certain witnesses."). It stands to reason that, if a prosecutor may permissibly comment on a particular issue, the jury may permissibly consider that issue in its deliberations. Appellant cites no authority establishing otherwise.

The trial court did not err by denying the motion for new trial on these grounds. We overrule appellant's ninth issue.

### 3. Medical Examiner's Testimony

Appellant's tenth and eleventh issues contend that his convictions were "based upon incorrect, uncorrected testimony" by Fernandez "that the distance of the gun shot to Rodriguez indicated four feet distance or more when, in fact, one could not tell the distance of the shot without the firearm." In an affidavit attached to the new trial motion, appellant's trial counsel averred that he "was and is very concerned that the prosecutor

26

caused the medical examiner to change his opinion from that stated in the autopsy report to one more convenient to the prosecution theory, without any notice to counsel."[4]

The use of material false evidence to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, regardless of whether the falsity is known to the State at the time of trial. *Ex parte De La Cruz*, 466 S.W.3d 855, 866 (Tex. Crim. App. 2015); *see* U.S. CONST. amends. V, XIV; *Napue v. Illinois*, 360 U.S. 264, 269 (1959). To be entitled to post-conviction relief on the basis of false evidence, an appellant must show by a preponderance of the evidence that (1) false evidence was presented at his trial and (2) the false evidence was material to the jury's verdict of guilt. *De La Cruz*, 466 S.W.3d at 866.

Appellant complains that, while Fernandez's autopsy report stated that the range of the gunshot that killed Rodriguez was "indeterminate," he testified at trial that the shots were fired from at least about two and a half feet away. Appellant assumes that the two assessments conflict, and he postulates that only the former one is correct. But Fernandez acknowledged and affirmed the accuracy of his autopsy report at trial, and he explained how the assessments are mutually consistent:

> You can have a contact wound where the muzzle of the gun is at the surface of the body, and you can have . . . a near contact wound where it's almost in contact with the surface of the body, or angle contact wound where it's angled and with a contact wound to the body. And then as you get further away, you get what you call a close range wound where you have the soot

---

[4] When asked to elaborate on this at the new trial hearing, counsel testified:

Well, it seems—it occurred to me that the prosecution had misidentified [appellant] in the surveillance tapes. It occurred to me that they thought that [appellant] was a different individual in the surveillance tapes, and that at the time of the shooting, he would have been 25 feet away. But they later figured out that that person that they thought was [appellant] was actually not [appellant]. I don't know whether I contributed to their figuring it out or not, because I know I tried to point it out to the jury that they had identified the wrong person. I thought that might be helpful. Obviously, it wasn't. So I—I think that might be why it got stretched out that far away so that—but I'm not sure.

27

and some of the—some of the stippling. And then as you get further out within the two feet, you just get the powder tattooing and that would be called the intermediate range. So when you get further out than that, you don't have any of those findings, searing, soot or stippling, that's considered distance—distant range wound consistent with distant range wound or indeterminate range.

In any event, appellant does not point to any evidence in the record establishing that Fernandez's trial testimony was false or that it gave the jury a false impression. *See id.* ("[T]he relevant question is whether the testimony, taken as a whole, gives the jury a false impression."). Accordingly, the trial court did not abuse its discretion by denying a new trial on this basis.

Appellant's tenth and eleventh issues are overruled.

### 4. Newly Available Evidence

Appellant argues by his twelfth issue that the trial court erred in denying his motion for new trial on grounds of newly available evidence.[5] Appellant neither sets forth nor discusses the law applicable to the granting of a new trial on these grounds. *See* Tex. Code Crim. Proc. Ann. art. 40.001 (West, Westlaw through 2017 1st C.S.) ("A new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial."); *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014) (setting forth a four-pronged test a defendant must satisfy in order to be entitled to a new trial on the basis of newly discovered or newly available evidence). Accordingly, appellant's twelfth issue is waived as inadequately briefed. *See* Tex. R. App. P. 38.1(i).

---

[5] Specifically, appellant presented the testimony of the following "newly available" witnesses at the new trial hearing: (1) a "forensic audio and video expert" who enhanced a portion of the surveillance footage and opined that it did not show that Karen was carrying a gun when she returned to the parking lot of the Office Club; (2) an associate of appellant and eyewitness to the shooting, who stated that appellant and Rodriguez "wrestle[d]" for several minutes prior to the shooting and that Rodriguez was the aggressor; (3) appellant's girlfriend, who stated she did not see Karen give appellant a gun; and (4) McDaniel, who stated Rodriguez was "[r]eady for something to happen" on the night of July 9, 2016.

### III.  Conclusion

Having overruled appellant's thirteen issues, we affirm the trial court's judgment.

DORI CONTRERAS
Chief Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
9th day of May, 2019.